Harry McClurg, Appellant, v. James M. Brenton, Fred Brackett, W. P. Crewse, Charles Davis, Appellees.

**Unlawful Search: CONSENT: EVIDENCE.** In an action for damages
1    for searching plaintiff's residence for stolen property without a warrant, the evidence is considered and held to be in conflict on the question of plaintiff's consent to search, and a directed verdict for defendants therefore erroneous.

**Unlawful Search.** A search of a private residence without a warrant for that purpose cannot be justified even though made by
2    an officer.

**Evidence: MALICE.** Evidence, in an action for wrongful search,
3    as to the conduct of hounds used to track the thief is only admissible on the question of malice, in mitigation of damages.

**Unlawful Search: USE OF HOUNDS: EVIDENCE.** In an action for
4    an unlawful search aided by the use of hounds, evidence as to the breeding and training of the dogs, letters endorsing their usefulness, and stories concerning their ability are inadmissible.

**Evidence: PHOTOGRAPHS.** In a prosecution for an unlawful search
5    it is error to permit the introduction of photographs of hounds used in locating the suspected thief.

*Appeal from Polk District Court.*—Hon. W. H. McHenry, Judge.

Wednesday, March 16, 1904.

Action at law to recover damages for an alleged unlawful search of plaintiff's premises. Verdict for defendants by direction of the court, and judgment accordingly. Plaintiff appeals.—*Reversed.*

*McVey, McVey & Graham* and *J. D. Laws* for appellant.

*Read & Read* and *Myerly & Myerly* for appellees.

WEAVER, J.—That the appellees did search the house and premises of the plaintiff for the discovery of alleged stolen property, and that such search was made without any warrant issued for that purpose, was not denied on the trial below, and is conceded in argument. The claim is made, however, that this act, otherwise unlawful, was done with the consent of the plaintiff, and it was upon the theory that this defense had been established without substantial dispute that the trial court directed a verdict against the appellant. We have therefore to consider whether the evidence made a case from which the jury might properly have found in appellant's favor. At the date of the transaction in question, the defendant Brenton was mayor of the city of Des Moines, Brackett was chief of police, and Crewse was captain of the night force of said city. Plaintiff was the head of a family, residing in Des Moines, near the boundary line between that city and the town of Valley Junction. The evidence, giving it the most favorable construction which it will reasonably bear in plaintiff's favor, as we are required to do for the purposes of this appeal, tends to show the following state of facts: On or about May 2, 1902, "a Mr. Brown" informed the mayor that a neighbor, from whom some chickens had been stolen, desired the officers to bring out certain bloodhounds kept in the city, and try to trace the thief. Responding to this call in person, the mayor on the same evening started for the scene of action, accompanied by quite a retinue of followers. Among the number were the chief of police, the captain of the night force, a city alderman, the city physician, the "man with the hounds," and various other gentlemen, presumably volunteers in the cause of retributive justice. The order and line of march are not made clear by the testimony, and we have not been favored with any maps or charts showing the disposition of the forces. It does appear that some time during the evening they rendevoused at Valley Junction, from which base of operations the advance upon plaintiff's house was made

*1. UNLAWFUL search: consent: evidence.*

about ten or eleven o'clock p. m.  The dogs were taken to the premises of the person who claimed to have lost the chickens, and there turned loose for a trial of their detective skill.  Following their lead, as is claimed, the mayor's forces came to the home of the plaintiff, who, unsuspicious of this canine impeachment of his good name and fame, had retired with his family for the night.  The mayor and captain of the night force advanced to the door, gave the alarm in due form, and demanded entrance.  Soon the door opened "about five or six inches," it is said, revealing the plaintiff clad in a nightrobe, and armed with an iron poker.  The captain, turning his head aside to avoid an anticipated blow from the poker, at the same time deftly inserted his foot between the door and the jamb, thereby retaining all the advantage thus far gained.  The mayor, noting the captain's peril, interposed to prevent any assault upon him by promptly warning the plaintiff: "None of that goes here.  I am mayor of the city of Des Moines, and we are here on official business."  Naturally this proclamation tended to chill the ardor of the defense, and the door was soon opened—whether by the act of the plaintiff from within, or by pressure from the party without, is a matter of controversy.

The defendants testify that, on being informed of the official character of the mayor's party and the object of their call, plaintiff allowed them to proceed and make the search; and, if this was not disputed, the ruling of the lower court could, perhaps, be sustained, although it is not free from doubt that a consent obtained in the manner, and under the circumstances portrayed by the defendants themselves, would be, in any just sense of the word, a free and voluntary act. But the evidence as to the alleged consent is by no means all one way.  Plaintiff and his two sons distinctly deny that consent was given to the entry into the house or to its search, and declare that the door was forced open against the resistance of the plaintiff, that the poker was forcibly wrested from plaintiff's hands, and that, when one of the sons attempted to hand the key of the chicken house to his father, one of the

mayor's party unceremoniously took possession of it, and thereby gained entrance to the chicken house. In some material respects their story finds corroboration in the testimony of the witnesses for the defense. There is testimony, also, that the search was conducted, by some of the party at least, in a loud and boisterous manner, and with little regard for the sensibilities of the plaintiff and his family. One of the searchers candidly admits that he was a "little enthused," and did not pay much attention to the details; and it is said by one witness that another member of the party became somewhat confused as to the real object of the search, and demanded to know whether there was "any beer in the cellar." The discouraging answer that there "was no cellar" seems not to have been fully credited, for it is further testified that the knot holes in the floor were carefully probed with a pocket rule, to ascertain the amount of available space thereunder. Upon such a state of the record, we think it very clear that the jury should have been allowed to pass upon the issue of fact presented by the pleadings. If plaintiff's home was invaded in the manner claimed by him, he has suffered a wrong for which the law will afford him substantial remedy. On the other hand, if he freely and voluntarily surrendered his premises to the search, as claimed by the defendants, he has suffered no wrong; but, the fact being in dispute the court cannot rightfully intervene to direct a verdict for either party. The right of the citizen to occupy and enjoy his home, however mean or humble, free from arbitrary invasion and search, has for centuries been protected with the most solicitous care by every court in the English-speaking world, from Magna Charta down to the present, and is embodied in every bill of rights defining the limits of governmental power in our own republic.

The mere fact that a man is an officer, whether of high or low degree, gives him no more right than is possessed by the ordinary private citizen to break in upon the privacy of

2. Unlawful search.

a home and subject its occupants to the indignity of a search for the evidences of crime, with-

out a legal warrant procured for that purpose. No amount of incriminating evidence, whatever its source, will supply the place of such warrant. At the closed door of the home, be it palace or hovel, even bloodhounds must wait till the law, by authoritative process, bids it open. Even with a warrant, the law of this state forbids a search in the nighttime, save upon a showing therefor, and upon special authority expressed in the writ. Code, section 5555. A right thus carefully guarded by the statute as well as by the common law is not to be lightly disregarded.

II. Plaintiff assigns error upon the ruling of the trial court admitting testimony offered by defendants as to the conduct of the dogs in leading the searching party to his house. Its admission is sought to be justified

3. EVIDENCE: malice.

by defendants as being a part of the *res gestae,* and upon the question of malice. As a part of the circumstances leading immediately to the search and thus, perhaps, tending to disclose something of the motive actuating the defendants, we are inclined to hold, though not without some hesitation, that it was allowable for the defendants to prove the facts as to the presence of the dogs and the use made of them on the occasion under investigation. Beyond that, however, the defendants should not have been permitted to go. It must be borne in mind that this is not an action for malicious prosecution or malicious arrest, but for an alleged wrongful and unauthorized trespass upon plaintiff's home and property. In a case of the former kind, an honest belief in the guilt of the person prosecuted or arrested, and the facts and circumstances on which such belief is founded, are ordinarily proper matters of inquiry; and such circumstances, if amounting to probable cause for the proceeding complained of, will constitute a complete defense to a suit for damages. But in a case like the one at bar the doctrine or rule of probable cause has no application. To illustrate, in an action for damages for malicious prosecution for theft the defendant may plead and prove that plaintiff was in fact guilty of the crime charged against him, and thus establish a perfect de-

fense.   But in an action for an unlawful search it is no defense whatever to say that plaintiff was a thief, or did in fact have the stolen property upon his premises.   The fact may be admitted, but the right of action remains.   There is but one possible phase of the case upon which the admission of any testimony of this kind can be upheld.   If the jury should find for plaintiff—that the wrongful search was made, and that in such act the defendants were moved or inspired by malice toward the plaintiff—they could, in addition to actual damages, assess a greater or less sum against the defendants by way of punishment or as exemplary damages.   In mitigation of such damages, only, evidence may be received of any fact which fairly and reasonably tends to show that the act, was done in good faith and without malice.   Motive and intent being of the essence of the inquiry where exemplary damages are sought, any evidence which fairly tends to their disclosure is admissible.   *Redfield v. Redfield,* 75 Iowa, 435; *Wallace v. Finch,* 24 Mich. 255; *Camp v. Camp,* 59 Vt. 667 (10 Atl. Rep. 748); *Voltz v. Blackmar,* 64 N. Y. 440. It is necessary, however, for the court to carefully guard the application of this rule, to prevent its being made an open door for the introduction in evidence of much that is immaterial, irrelevant, and confusing; and the jury should be informed in cases of this nature that evidence of good motive or absence of malice goes only to the matter of assessing damages by way of punishment or example, and should be wholly disregarded in assessing actual or compensatory damages.

III.   Much evidence was admitted over plaintiff's objection which was merely laudatory of the fame and royal lineage of the hounds employed in the raid upon the plaintiff's premises.   For instance, the mayor, as a witness, was permitted to state what he had been informed as to the breeding and training of the animals, and what he had heard of their work, and that an old schoolmate of the witness had highly indorsed them in a letter.   In view of the well-known ease with which letters of indorsement from good men are procured by all kinds of

4. Unlawful search: use of hounds: evidence.

candidates for favor it may, perhaps, be presumed that credentials of this sort could have no weight with the jury, and that plaintiff suffered no prejudice therefrom; but we think the matter so clearly incompetent and immaterial that the objection thereto should have been sustained. The witness Quint was also allowed to testify that he represents a company which insures banks against burgglary, and makes it a business to "punish and prosecute criminals," and that in such capacity he had looked up the history of the hounds, with a view to utilizing their services in the company's business. From this investigation he says he was "led to believe them finely bred, safe, and sure, trained for great capacity in following and tracking and using the scent, quite intelligent, and probably the best hounds in the West"; a statement which he emphasized by stories gleaned from hearsay—how by the remarkable instinct of these dogs a robbery of a bank had been frustrated and the murderer of a woman had been driven to suicide after a chase of thirty miles, the only clue given the dogs being a scent "from a pair of socks" of the fleeing malefactor.

As a seal to this eulogium, the witness produced photographs of the hounds, which were admitted in evidence. The particular point in controversy which these portraits were intended to illuminate is not pointed out by counsel, and our unaided efforts in that direction have proved fruitless. All this testimony both of the mayor and Quint was objected to by the plaintiff, and should have been excluded. The matter being tried was the alleged trespass upon plaintiff's home, not plaintiff's guilt or innocence of chicken stealing, nor the pedigree, training, skill, or appearance of the bloodhounds—a distinction which at times seems to have been overlooked in the presentation of the testimony.

5. EVIDENCE: photographs.

IV. Complaint is also made of the action of the trial court in allowing defendants to amend their answer upon the eve of trial; but to permit amendment is a rule applied by

courts with great liberality, and we find nothing to indicate that the discretion thus universally exercised was abused in the present instance. Other questions raised are such as are not likely to arise upon a retrial, and we do not consider them.

For the reasons stated, the judgment appealed from is REVERSED.