APPEL, Justice (dissenting).
I dissent. The controversy in this case involves an allegation of a specific constitutional violation, namely, whether an allegedly unconstitutional seizure of a person by local law enforcement gives rise to a claim of damages. I would answer the certified question by stating that there is no immunity available to shield the defendants from liability for the alleged harm caused by their constitutional torts arising out of article I, section 1 and article I, section 8 of the Iowa Constitution.
I. Liability of the City for Money Damages.
There is a preliminary issue in the case. The City of Estherville (the City) is a defendant in this case. The State of Iowa, as an amicus, urges us to consider whether a local government entity may be sued for money damages for constitutional violations. The question of the City's liability for constitutional violations of its employees is a distinctly different question than whether individual officers employed by the City are entitled to some form of qualified immunity for their unconstitutional conduct.
The United States Supreme Court has addressed the question in *282 Monell v. Department of Social Services , 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In Monell , the United States Supreme Court held that although local governments are "persons" under 42 U.S.C. § 1983, they cannot be held liable under a respondeat superior theory for the constitutional deprivations arising from the conduct of their employees unless the conduct was as a result of a government custom or practice. Id. at 690-91, 98 S.Ct. at 2035-36. The Monell Court did not specifically expand on the circumstances where a municipality could be found liable under the statute, but as a matter of practice, when a plaintiff attempts to prove an unwritten policy or municipal inaction, proof of liability under Monell is "exceptionally difficult." John M. Greabe, Remedial Discretion in Constitutional Adjudication , 62 Buff. L. Rev. 881, 907 n.142 (2014).
In an important subsequent case, Owen v. City of Independence , the United States Supreme Court determined that when a plaintiff successfully demonstrates that a municipality has a custom or policy that violated his or her constitutional rights, the municipality is strictly liable for the violation. 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980). The Owen Court noted that "in the hundreds of cases from [the common law] era awarding damages against municipal governments for wrongs committed by them, one searches in vain for much mention of a qualified immunity based on the good faith of municipal officers." Id. at 641, 100 S.Ct. at 1410.
The Owen Court emphasized that the strict-liability approach to unconstitutional municipal policies and customs has sound policy footing. Id. at 650, 100 S.Ct. at 1415.
How "uniquely amiss" it would be ... if the government itself-"the social organ to which all in our society look for the promotion of liberty, justice, fair and equal treatment, and the setting of worthy norms and goals for social conduct"-were permitted to disavow liability for the injury it has begotten.
Id. at 651, 100 S. Ct. at 1415 (quoting Adickes v. S.H. Kress & Co. , 398 U.S. 144, 190, 90 S.Ct. 1598, 1620, 26 L.Ed.2d 142 (1970) (Brennan, J., concurring in part and dissenting in part)). According to the Court,
The knowledge that a municipality will be liable for all of its injurious conduct, whether committed in good faith or not, should create an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights.
Id. at 651-52, 100 S. Ct. at 1416.
The Owen Court sharply distinguished between the liability of municipalities and liability of individual officials. Id. at 655-56, 100 S.Ct. at 1418. The Court noted that the justification for qualified immunity for individual officials is based upon the threat of personal liability. Id. Where liability of municipalities is involved, however, "[t]he inhibiting effect is significantly reduced, if not eliminated ... [because] the threat of personal liability is removed." Id. at 656, 100 S.Ct. at 1418.
There are substantial reasons for following Owen but not Monell in determining municipalities' potential liability for the constitutional wrongs of their employees. Monell does not involve a constitutional issue, but only a statutory issue under federal law. See 436 U.S. at 660 & n.1, 98 S.Ct. at 2020 & n.1. Further, the substantive holding in Monell has been subject to substantial criticism. See, e.g. , David Jacks Achtenberg, Taking History Seriously: Municipal Liability Under 42 U.S.C. § 1983 and the Debate over Respondeat Superior , 73 Fordham L. Rev. 2183, 2196 (2005) ; Michael J. Gerhardt, *283 The Monell Legacy: Balancing Federalism Concerns and Municipal Accountability Under Section 1983 , 62 S. Cal. L. Rev. 539, 540-41 (1989) ; Myriam E. Gilles, Breaking the Code of Silence: Rediscovering "Custom" in Section 1983 Municipal Liability , 80 B.U. L. Rev. 17, 29-31 (2000). As a result, it is not surprising that several state courts have declined to follow the statutory interpretation in Monell on the constitutional question of whether a city is liable for the torts of its employees under a respondeat superior theory. See, e.g. , Town of Port Deposit v. Petetit , 113 Md.App. 401, 688 A.2d 54, 65 (1992) (holding municipality may be liable for constitutional torts under respondeat superior theory); Washington v. Robertson County , 29 S.W.3d 466, 475-77 (Tenn. 2000) (same).
However, the parties, in this case, do not directly address the Monell issue or the application of Monell in Owen but concentrate their advocacy on the question of whether individual city employees are entitled to qualified immunity with respect to damage claims arising from their unconstitutional conduct. Ordinarily, we do not consider issues raised only by amici and not by the parties themselves. See Press-Citizen Co. v. Univ. of Iowa , 817 N.W.2d 480, 493 (Iowa 2012) ; Mueller v. St. Ansgar State Bank , 465 N.W.2d 659, 660 (Iowa 1991).
The majority in this case has now judicially created a type of immunity for individual officers. As explained below, I dissent from the majority's approach to individual liability for constitutional wrongs. The majority's approach, however, increases the pressure to reject the limitations in Monell and apply the strict-liability approach in Owen across the board to claims against municipalities.
Nevertheless, the issue of municipal liability for damages caused by the unconstitutional conduct of its employees was not presented by the parties in this case, is not addressed in the majority opinion, and is reserved for another day.
II. Qualified Immunity of Individual Officers.
A. Introduction. I next address the fighting issue joined by the parties, namely, whether Iowa should adopt a qualified immunity doctrine patterned after the one adopted by the United States Supreme Court in its cases under 42 U.S.C. § 1983. The City and the individual defendants present us with a compendium of federal statutory immunity cases that they suggest should guide us in determining whether the individual defendants are entitled to an immunity shield to prevent an award of damages for injuries they caused through their unconstitutional conduct. Similarly, the State urges us to follow federal quasi-immunity doctrine for claims brought against state officers under the Iowa Constitution. The plaintiff takes the challenge head on, urging us not to follow federal quasi-immunity law. That is the issue that the parties have briefed and asked us to decide.
B. Rejection of Federal Statutory Qualified Immunity as a Model for Iowa Constitutional Law.
1. Overview. I begin by emphasizing that the policy-oriented federal doctrine of statutory qualified immunity does not provide a model for determining whether individuals are entitled to qualified immunity for Iowa constitutional torts. The federal doctrine of statutory qualified immunity progressively dilutes legal norms, embraces numerous false assumptions, fails to recognize the important role of juries in restraining government, and is inconsistent with important tenants of Iowa law. We should not voluntarily drape our constitutional law with the heavy chains of indefensible doctrine. We should aim to eliminate *284 fictions in our law and be honest and forthright on the important question of what happens when officers of the law commit constitutional wrongs that inflict serious reputational, emotional, and financial harms on our citizens.
2. It's not the tail of the dog; it's the dog. First, one must recognize what is at stake when a doctrine limits remedies available for a legal violation. The limitation of remedies is not a sideshow, collateral issue, or footnote in the development of the law. Remedial doctrine is at the heart of substantive law. As Karl Llewellyn wrote, a "[d]efect of remedy is [a] defect of right." Aaron Belzer, Comment, The Audacity of Ignoring Hope: How the Existing Qualified Immunity Analysis Leads to Unremedied Rights , 90 Denv. U. L. Rev. 647, 673 (2012) [hereinafter Belzer] (quoting Karl N. Llewellyn, The Bramble Bush 88 (1930)). As Chief Justice Marshall stated in Marbury v. Madison , "[I]t is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded." 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803) (quoting 3 William Blackstone, Commentaries on the Laws of England 23 (1765-1769)). As Professor Akhil Reed Amar has more recently observed, governments acting unconstitutionally "must in some way undo the violation by ensuring that victims are made whole." Akhil Reed Amar, Of Sovereignty and Federalism , 96 Yale L.J. 1425, 1427 (1987) [hereinafter Amar].
A lack of remedy drives a stake in the heart of a substantive legal doctrine. In the words of Justice Harlan in Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics , contemporary modes of thought at the time of the United States Constitutional Convention reflected "modes of jurisprudential thought which appeared to link 'rights' and 'remedies' in a 1:1 correlation." 403 U.S. 388, 400 n.3, 91 S.Ct. 1999, 2007 n.3, 29 L.Ed.2d 619 (1971) (Harlan, J., concurring in the judgment). We should tread very carefully before we limit the scope of remedies for unconstitutional conduct because we are, in effect, cutting down the scope of the substantive rights involved. Make no mistake, this case is not about the tail on the dog. It is about the dog.
The notion that judges may create a "gap" between constitutional rights and the remedies afforded is untenable. The consequence of such a gap is to effectively reduce the constitutional protections afforded to the public. To the extent they are not enforced, the nice words in the constitution do not mean what they seem to mean.
3. Search and seizure: the wrong place for trenching on remedies for constitutional torts. Of all the places to engage in constitutional dilution through sharp remedial restriction, search and seizure law is the last place to do so. Constitutional protections related to search and seizure are fundamental to liberty. Under article I, section 8 of the Iowa Constitution, searches and seizures, subject to a few "jealously and carefully drawn exceptions" where a warrant cannot practicably be obtained, are subject to the warrant requirement. State v. Ochoa , 792 N.W.2d 260, 285 (Iowa 2010) (quoting State v. Strong , 493 N.W.2d 834, 836 (Iowa 1992) ). The warrant requirement means that the application must be in writing and not based on ephemeral oral assertions. See Battani v. Grund , 244 Iowa 623, 628, 56 N.W.2d 166, 170 (1952). The warrant application must establish the basis for the government's intrusive search and seizure action before the action is taken-the state may not rely on after-the-fact recasting of reasons to conform to the results of the search. See *285 State v. Angel , 893 N.W.2d 904, 915 (Iowa 2017) (Appel, J., dissenting). The search or seizure must be based upon probable cause and not mere hunches. See State v. McNeal , 867 N.W.2d 91, 99 (Iowa 2015) ; State v. Gogg , 561 N.W.2d 360, 363 (Iowa 1997).
The importance of effective enforcement of search and seizure restrictions on government was not lost on the generation of lawyers and judges who witnessed the collapse of the rule of law in central Europe in the 1930s. As Chief Nuremburg Prosecutor Justice Robert Jackson so eloquently opined after his return from his assignment in immediate postwar Germany, search and seizure rights
are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government.
Brinegar v. United States , 338 U.S. 160, 180, 69 S.Ct. 1302, 1313, 93 L.Ed. 1879 (1949) (Jackson, J., dissenting). See generally Victoria A. Graffeo, Robert H. Jackson: His Years as a Public Servant "Learned in the Law," 68 Albany L. Rev. 539, 546 (2005).
Regrettably, the United States Supreme Court has in recent decades announced a series of opinions that undercut search and seizure protections. See Silas J. Wasserstrom, The Incredible Shrinking Fourth Amendment , 21 Am. Crim. L. Rev. 257, 259-61 (1984). The limitation of constitutional remedies by the Supreme Court has been part of the trend of the Court to restrict the scope of constitutional protections in the context of search and seizure. See id. at 291-94, 292 nn.186-87, 300 & n.216. We must recognize that this case falls squarely within the recent efforts to limit protections that citizens have from arbitrary government search and seizure actions. The question cannot be avoided: should we dilute the search and seizure protections of our citizens enshrined in article I, section 8 of the Iowa Constitution through a judicially or legislatively created constitutional immunity of some kind?
The importance of claims brought under article I, section 1 of the Iowa Constitution cannot be rendered a mere appendage either. Article I, section 1 was purposefully placed at the beginning of the Bill of Rights. See 1 The Debates of the Constitutional Convention of the State of Iowa 103-04 (W. Blair Lord rep. 1857), [hereinafter The Debates ], http://www.statelibraryofiowa.org/services/collections/law-library/iaconst. It makes the point of emphasizing "inalienable rights," which, I take it, includes rights that cannot be abrogated by the legislature, or this court. Further, the "free and equal" provision of article I, section 1 is at the heart of our government structure and provided the constitutional foundation to Coger v. Northwestern Union Packet Co. , an important and highly celebrated case prohibiting discrimination by a steamboat operator against a female passenger "partly of African descent." 37 Iowa 145, 147, 153-55 (1873). Like article I, section 8, this constitutional provision is not the place to cut remedial corners. Indeed, it is an area requiring exceptional remedial vigilance.
In short, when citizens suffer potentially grievous harms from unconstitutional conduct in violation of article I, section 1 or article I, section 8, we should require the officials who engaged in the unconstitutional conduct to bear the burden of the loss. We should not allow the officials who engage in unconstitutional conduct to respond to the prayer of the harmed citizen with, "Aw, tough luck. Tut tut. Bye bye."
*286 4. Sandy foundation: historical common law fiction in federal statutory immunity cases . In interpreting whether 42 U.S.C. § 1983 provides statutory qualified immunity, the United States Supreme Court has sometimes stated that the qualified immunity defense simply follows the common law that existed at the time of the legislation's passage in 1871. See Nixon v. Fitzgerald , 457 U.S. 731, 745-46, 102 S.Ct. 2690, 2699, 73 L.Ed.2d 349 (1982). But this overbroad generality is simply wrong.
It is true that at common law, judges and legislators acting within their appropriate authority were entitled to robust immunity. See Pierson v. Ray , 386 U.S. 547, 553-54, 87 S.Ct. 1213, 1217-18, 18 L.Ed.2d 288 (1967) (acts of judges); Tenney v. Brandhove , 341 U.S. 367, 376, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951) (acts of legislators). But the same degree of protection simply did not extend to officers of the Crown, who were expected "to be mulcted in damages for their errors of judgment." Ilan Wurman, Qualified Immunity and Statutory Interpretation , 37 Seattle U. L. Rev. 939, 987 (2014) [hereinafter Wurman]. As noted by Justice Brennan in Bivens , "Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." 403 U.S. at 395, 91 S.Ct. at 2004 (majority opinion).
For example, the outrage of lawless search and seizure by government officials was recognized at common law in the Wilkes cases, where very large money judgments were entered against officials who, at the direction of Lord Halifax, ransacked private premises looking for tell-tale signs of who authored a scurrilous broadside critical of the Crown. Wilkes v. Wood (1763) 98 Eng. Rep. 489, 489, 498-99; Huckle v. Money (1763) 95 Eng. Rep. 768, 768-69; Entick v. Carrington (1765) 95 Eng. Rep. 807, 807-08, 811, 818; see Godfrey v. State , 898 N.W.2d 844, 866-67 (Iowa 2017) (describing the cases). These unlawful searches cost the officials involved a lot of money. Schoolchildren know about the shot heard around the world, but we seem to have forgotten about the cases heard around the world-the Wilkes cases.
Plainly, as Lord Halifax learned to his financial embarrassment in the Wilkes cases, common law absolute immunities for judges and legislators did not apply "across the board" to officers of the Crown. As Professor Jaffe pointed out many years ago, the claims of official immunity exclude "the historic liability of sheriffs and peace officers." Louis L. Jaffe, Suits Against Governments and Officers: Damage Actions , 77 Harv. L. Rev. 209, 221-22 (1963) ; see also Max P. Rapacz, Protection of Officers Who Act Under Unconstitutional Statutes , 11 Minn. L. Rev. 585, 585 (1927) ("Prior to 1880 there seems to have been absolute uniformity in holding officers liable for injuries resulting from the enforcement of unconstitutional acts."). The common law provenance of broad-brushed statutory qualified immunity asserted by the United States Supreme Court in its statutory qualified immunity cases is based on an incorrect view of common law history.
John Wilkes was a folk hero in the American colonies. As noted by a leading Wilkes biographer, his "every move was followed in the American press, and his victories over government celebrated in the colonies." Arthur H. Cash, John Wilkes: The Scandalous Father of Civil Liberty 2 (2006) [hereinafter Cash]. Wilkes corresponded with Samuel Adams and John Hancock, among others. Id. "The Commons House of South Carolina sent him fifteen hundred pounds and closed down the provincial government rather than obey the royal governor's demand to rescind the gift." Id. According to historian *287 Merrill Jensen, by the end of 1768, " 'Wilkes and Liberty' was a toast from one end of the colonies to the other." Id. at 232 (quoting Merrill Jensen, The Founding of a Nation: A History of the American Revolution, 1763-1776 , at 260 (1968)). Paul Revere made a silver punch bowl with the engraving "No General Warrants" and "Wilkes and Liberty." See Ochoa , 792 N.W.2d at 270. "Wilkes received letters of support from John Adams and Joseph Warren." Id. And in a deeply tragic example of irony, the parents of John Wilkes Booth named their son after Wilkes as a tribute to freedom against tyranny. See Josh Chafetz, Impeachment and Assassination , 95 Minn. L. Rev. 347, 389 (2010). While Wilkes may not be a celebrity today, he and the Wilkes cases were well-known by the founding and antebellum generations.
The interesting case of Little v. Barreme demonstrates recognition of the general common law approach to liability for unlawful searches and seizures. 6 U.S. (2 Cranch) 170, 2 L.Ed. 243 (1804). A Danish vessel, the Flying Fish , was seized by Captain George Little. Id. at 176. The underlying law authorized seizure only if the vessel was going to a French port. Id. at 177-78. The Flying Fish was coming from a French port. Id. at 176. President Adams, however, had issued instructions that vessels that were coming from French ports could be seized. Id. at 170.
Chief Justice Marshall observed that "[t]he first bias of my mind was very strong in favor of the opinion that though the instructions of the executive could not give a right, they might yet excuse from damages." Id. at 179. He questioned whether a distinction could be drawn between military officers and civil officers, and between proceedings "in the country and those on the high seas." Id. In the end, though, Chief Justice Marshall recognized that civil officers generally are liable for their wrongs. See id. He determined that while the ship was "seized with pure intention" as a "consequence of orders from the legitimate authority," nevertheless "the [executive] instructions cannot change the nature of the transaction, or legalize an act which without those instructions would have been a plain trespass." Id. As noted by Professor William Baude, the thrust of the case is that "good-faith reliance did not create a defense to liability-what mattered was legality." William Baude, Is Qualified Immunity Unlawful? , 106 Calif. L. Rev. 45, 56 (2018) [hereinafter Baude].
Further, the Supreme Court has, in its constitutional immunity cases, confused the role of good faith as an element of a specific offense with the different and much broader notion of good-faith immunity. For instance, in Pierson , the Supreme Court cited the elements of the tort of false arrest at common law. 386 U.S. at 555, 87 S.Ct. at 1218. But the fact that bad faith and flagrancy are elements of certain common law torts is not a basis for a broadly framed, across-the-board constitutional immunity doctrine. See Baude, 106 Calif. L. Rev. at 59. And in Harlow v. Fitzgerald , the Court jettisoned subjective bad faith for objective bad faith, a clear departure from any approach to the common law immunities. 457 U.S. 800, 818-19, 102 S.Ct. 2727, 2738-39, 73 L.Ed.2d 396 (1982). This innovation had no basis at all in common law.
Even among members of the Supreme Court, the fiction that broad statutory qualified immunity under 42 U.S.C. § 1983 is supported by the common law is unraveling. At least three Justices have recognized that the statutory qualified immunities caselaw, in fact, departs from common law precedents. For example, in Wyatt v. Cole , Justice Kennedy noted that the Court had "diverged to a substantial degree *288 from the historical standards" of the common law and observed that statutory immunity was not supposed to be based upon "freewheeling policy choice[s]." 504 U.S. 158, 170, 112 S.Ct. 1827, 1835, 118 L.Ed.2d 504 (1992) (Kennedy, J., concurring) (alteration in original) (quoting Malley v. Briggs , 475 U.S. 335, 342, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) ). In a dissenting opinion in Crawford-El v. Britton , Justice Scalia noted that "our treatment of qualified immunity under 42 U.S.C. § 1983 has not purported to be faithful to the common-law immunities that existed when § 1983 was enacted." 523 U.S. 574, 611, 118 S.Ct. 1584, 1603, 140 L.Ed.2d 759 (1998) (Scalia, J., dissenting). Most recently, in Ziglar v. Abbasi , Justice Thomas observed that "we have diverged from the historical inquiry mandated by the statute." 582 U.S. ----, ----, 137 S.Ct. 1843, 1871, 198 L.Ed.2d 290 (2017) (Thomas, J., concurring in part and concurring in the judgment). The sandy foundation of federal statutory qualified immunity is not withstanding the test of time but rather is being washed away.
5. Square pegs in round holes. Using federal statutory qualified immunity doctrine to shape the immunity doctrine for state constitutional torts is forcing a square peg into a round hole. The federal law on qualified immunity has developed in the context of interpretation of 42 U.S.C. § 1983. There is no persuasive reason why federal statutory interpretation should be hurriedly, or deliberately, ripped out of the federal caselaw and frantically, or carefully, pasted into the North Western Reporter as Iowa state constitutional law. There is simply no reason to believe that the statutory interpretation provided by the United States Supreme Court is constitutionally required on the federal level, let alone required in an interpretation of state constitutional provisions. See Seth P. Waxman & Trevor W. Morrison, What Kind of Immunity? Federal Officers, State Criminal Law, and the Supremacy Clause , 112 Yale L.J. 2195, 2209 (2003) ("It bears emphasizing that qualified immunity does not appear to be constitutionally required.").
6. Missing the point: incorrect statutory interpretation of the Ku Klux Klan Act. In any event, there is reason to question the prevailing federal statutory interpretation. Congress enacted 42 U.S.C. § 1983 in 1871 to fight the Ku Klux Klan. See generally Michael H. LeRoy, Targeting White Supremacy in the Workplace , 29 Stan. L. & Pol'y Rev. 107, 120-23 (2018) [hereinafter LeRoy] (describing the history surrounding the enactment of the Act). The statute, of course, says not one word about governmental immunities. See 42 U.S.C. § 1983 (2012). In early American history, the "strict rule of personal official liability" was well-established, "even though its harshness to officials was quite clear." David E. Engdahl, Immunity and Accountability for Positive Governmental Wrongs , 44 U. Colo. L. Rev. 1, 19 (1972). To the extent the statute merely captured common law precedent existing in the United States in 1871, it would not include broad qualified immunity for officers engaging in unlawful searches and seizures.
Further, the Reconstruction Era Congress was determined, at least in 1871, to address the horrific intimidation, terror, and violence visited on African-Americans by white supremacists who gained control of state and local governments in the states of the former confederacy. See LeRoy, 29 Stan. L. & Pol'y Rev. at 121-23. We should never forget that while the Civil War ended in 1865 for most Iowans, a bitter and brutal battle continued against African-Americans in the former slave states. See Virginia v. Black , 538 U.S. 343, 353, 123 S.Ct. 1536, 1544, 155 L.Ed.2d 535 (2003) ("Soon the Klan imposed 'a veritable reign of terror' throughout the South."
*289 (quoting Stetson Kennedy, Southern Exposure 31 (1991))); Wadie E. Said, Humanitarian Law Project and the Supreme Court's Construction of Terrorism , 2011 BYU L. Rev. 1455, 1471-72 (characterizing the brutal tactics of the Klan to enforce white supremacy as organized terrorism).
The Civil Rights Act of 1866, which initiated the series of legislation that eventually included 42 U.S.C. § 1983, declared that it was "An Act to protect all Persons in the United States in their Civil Rights, and furnish the Means of their Vindication ." Civil Rights Act of 1866, ch. 31, 14 Stat. 27, 27. As Professor Gary Gildin has stressed, § 1983"provides that 'every person' acting under color of state law who deprives an individual of federal constitutional rights 'shall be liable to the party injured.' " Gary S. Gildin, Redressing Deprivations of Rights Secured by State Constitutions Outside the Shadow of the Supreme Court's Constitutional Remedies Jurisprudence , 115 Pa. St. L. Rev. 877, 888-89 (2011) (quoting 42 U.S.C. § 1983 ). The legislative history includes a declaration from an opponent of the bill that the legislation has "no limitation whatsoever upon the terms that are employed." Id. at 889 (quoting Monell , 436 U.S. at 685 n.45, 98 S.Ct. at 2033 n.45 ). Representative Bingham saw the bill as embracing Justice Harlan's one-to-one relationship between rights and remedies and "declared the bill's purpose to be 'enforcement ... of the Constitution on behalf of every individual citizen of the Republic ... to the extent of the rights guaranteed to him by the Constitution.' " Id. at 888 n.39 (quoting Monell , 436 U.S. at 685 n.45, 98 S.Ct. at 2033 n.45 ). A supporter in the House of Representatives noted that the § 1983 is remedial and should be "liberally and beneficently construed" to afford a remedy to the victim of constitutional wrongs. Id. at 889 & n.41 (quoting Monell , 436 U.S. at 684, 98 S.Ct. at 2032 ). Robust qualified immunity for individuals committing constitutional wrongs is completely inconsistent with the wording, the legislative history, and the challenging historical purpose of the statute.
7. Unbalanced policy analysis. Aside from erroneous appeals to common law and misconceptions about the contours of American history, qualified immunity for individual government officials is defended on policy grounds. It is suggested that without qualified immunity, the officials will be frozen because of fear of potential liability. This claim is unbalanced. If we are going to accept the premise that potential liability affects behavior, as advocates of immunities so fervently do, we need to look at the opposite side of the coin too, namely, if behavior is fundamentally affected by the imposition of tort liability, the removal of tort liability will also similarly impact behavior. If it is true that police conduct will be chilled by tort rules, then the granting of immunity will lead police to engage in more unconstitutional activities because they do not have to worry about potential liabilities. We must consider both halves of the deterrence walnut.
Indeed, at common law, an official's exposure to "being mulcted in damages was precisely the deterrent for errors of judgment." Wurman, 37 Seattle U. L. Rev. at 965. More recently, the NAACP Legal Defense Fund has explicitly called for a reexamination of the legal standards governing qualified immunity in light of police violence involving African-Americans. NAACP Legal Def. Fund, Statement on U.S. Supreme Court Decision Expanding Qualified Immunity for Police (Apr. 2, 2018), www.naacpldf.org/files/about-us/Kisela% 20Hughes% 20Decision% 20Statement.pdf [https://perma.cc/2ACT-QPP5]. According to the NAACP view, more deterrence is needed. Id. Judge Jon Newman agrees, calling upon Congress to abolish the defense of qualified immunity in order *290 to better control police misconduct. Jon O. Newman, Here's a Better Way to Punish the Police: Sue Them for Money , Wash. Post (June 23, 2016), http://wapo.st/28R2Np4?tid=ss_mail& utm_term=.16d65eac7e49y [https://perma.cc/2CSG-2ERG]. The libertarian Cato Institute has joined the fray, noting "the deleterious effect [that qualified immunity] has on the ability of citizens to vindicate their constitutional rights, and the subsequent erosion of accountability among public officials that the doctrine encourages." Brief of the Cato Institute as Amicus Curiae Supporting Plaintiffs-Appellees and Affirmance at 1, Williams v. Cline , 902 F.3d 643 (7th Cir. 2018) (No. 17-2603), https://object.cato.org/sites/cato.org/files/pubs/pdf/williams-v-cline-cato-amicus-brief-motion.pdf [https://perma.cc/R6UU-E7AB]; see also Devon W. Carbado, Blue-on-Black Violence: A Provisional Model of Some of the Causes , 104 Geo. L.J. 1479, 1519-24 (2016) (examining problems presented by qualified immunity and indemnification).
8. Stay in your own lane: judicial legislation. Further, the jeremiads about chilling official conduct ring hollow. Advocates of sharp restrictions on judicial protection of individual rights generally are also advocates of legislative supremacy. Well, then let's give the legislature the power to enact policy. To the extent that the legislature wishes to prevent lack of constitutional immunity from chilling police conduct, it may enact an indemnity statute. See Wurman, 37 Seattle U. L. Rev. at 965-66, 987. Indeed, in the antebellum years, the question of whether to indemnify public officers for their illegal conduct was assigned to the legislative branch. See James E. Pfander & Jonathan L. Hunt, Public Wrongs and Private Bills: Indemnification and Government Accountability in the Early Republic , 85 N.Y.U. L. Rev. 1862, 1925 (2010) [hereinafter Pfander & Hunt]. The nineteenth century approach "was to hold the officer accountable in court for violations of the victim's legal rights but then to indemnify the officer ... through the legislative process." Id.
The federal courts have deprived the legislature of this policy choice by an aggressive imposition of judicially created immunity. The handwringing of the United States Supreme Court in its qualified immunity cases shows a dissatisfaction with the common law and with the failure of the legislative branch to enact policy preferences that the majority of the Court seems to prefer. Qualified immunity is thus simply judicial legislation-it reflects dissatisfaction with the failure of the legislative process to relieve individual officers of liability through indemnification and the achievement of the desired policy result through judicially legislating a policy of qualified immunity.
9. The chewing and choking of constitutional rights. The federal approach to statutory qualified immunity embraces a dynamic that has progressively chewed and choked potential remedies for constitutional violations. The federal approach requires a plaintiff to overcome qualified immunity by demonstrating that the officials involved engaged in violations of "clearly established rights." Harlow , 457 U.S. at 819, 102 S.Ct. at 2739. A key question, of course, is at what level of generality is this test imposed? The federal caselaw suggests that the level of generality has become increasingly specific-namely, that unless there is an authoritative, reported case that is nearly factually identical to the case in question, the constitutional right is not clearly established. See Kerns v. Bader , 663 F.3d 1173, 1191, 1198-99 (10th Cir. 2011) (Holloway, J., dissenting) (observing plaintiff would need to find a case nearly identical on the facts, a virtually impossible task); Belzer, 90 Denv. U. L. Rev. at 650 (arguing that the caselaw creates "an insurmountable *291 hurdle" for plaintiffs); Wurman, 37 Seattle U. L. Rev. at 944 (noting level of generality is crucial in qualified immunity context).
Further, in determining whether there has been a violation of constitutional rights, the federal courts jettisoned any subjective test in favor of a "reasonableness" test in determining whether the actions of the officers qualify for immunity. See Harlow , 457 U.S. at 819, 102 S.Ct. at 2739. The objective reasonableness test is, of course, so amorphous that some liability might have emerged for officials, so the federal caselaw has now tightened the screw another turn by replacing or supplementing the objectively reasonable standard with the new formulation of "entirely unreasonable." Messerschmidt v. Millender , 565 U.S. 535, 547, 132 S.Ct. 1235, 1245, 182 L.Ed.2d 47 (2012).
And, there is more. By now allowing, if not encouraging, courts not to reach the question of whether a constitutional violation actually occurred, but only whether the right involved was "clearly established," the constitutional immunity doctrine has prevented the development of substantive constitutional law by reducing the number of cases that address claims on the constitutional merits. See Camreta v. Greene , 563 U.S. 692, 705-06, 131 S.Ct. 2020, 2031, 179 L.Ed.2d 1118 (2011) ("[O]ur usual adjudicatory rules suggest that a court should forbear resolving the [constitutional] issue. ... Small wonder then, that a court might leave that issue for another day. But we have long recognized that this day may never come-that our regular policy of avoidance sometimes does not fit the qualified immunity situation because it threatens to leave standards of official conduct permanently in limbo." (Citations omitted.)). The federal constitutional immunity doctrine thus serves to limit the development of constitutional law by eliminating consideration of constitutional uncertainties in filed cases. Belzer, 90 Denv. U. L. Rev. at 685. Further, the presence of difficult-to-meet constitutional immunity standards has dramatic impact in law offices where lawyers and putative clients weight the practicalities of bringing constitutionally based legal actions in the face of strong immunity headwinds. See Alexander A. Reinert, Does Qualified Immunity Matter? , 8 U. St. Thomas L.J. 477, 494-95 (2011) (noting "qualified immunity plays a large role in case selection" and "limit[s] the extent to which civil rights litigation tests the boundaries of the law"). The creation of artificial immunities for constitutional violations is bad news for the development of state constitutional law.
C. Iowa Code Chapters 669 and 670. Iowa Code chapters 669 and 670 are the Iowa Tort Claims Act and the Municipal Tort Claims Act. The Acts begin with the premise that state and local governments are generally liable for tortious acts as are ordinary citizens. The Acts, however, have sweeping exceptions.
The Iowa Tort Claims Act broadly exempts the state from liability for claims "arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." Iowa Code § 669.14(4) (2017). Further, the state is exempt from liability for any claims brought by an inmate. Id. § 669.14(6). These provisions, if enforced with respect to constitutional claims, would dramatically undermine the scope of available remedies in a wide variety of actions.
The Municipal Tort Claims Act also provides for liability of local government, subject to enumerated exceptions. Id. § 670.2(1). The exceptions are different than under the Iowa Tort Claims Act.
*292 Compare id. § 669.14, with id. § 670.4. The Municipal Tort Claims Act excludes from liability any claim arising out of an act or omission of an officer "exercising due care, in the execution of a statute, ordinance, or regulation ... or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty." Id. § 670.4(1)(c ). Further, claims for punitive damages are not allowed. Id. § 670.4(1)(e ). Depending on interpretation, application of these Code provisions to situations where government officials cause grievous harm could dramatically reduce any possible recovery.
These statutory provisions are not of much value in determining whether there is qualified immunity for officers who commit constitutional torts. The very purpose of the Bill of Rights is to restrain the majoritarian branches of government. These provisions are distinctly antimajoritarian. It would be a fox-in-the-henhouse problem to permit the legislature to define the scope of protection available to citizens for violation of constitutional rights. As noted by Professor Amar, "When governments act ultra vires and transgress the boundaries of their charter, ... their sovereign power to immunize themselves is strictly limited by the remedial imperative." Amar, 96 Yale L.J. at 1490.
III. No Immunity Under Iowa Constitutional Law for Search and Seizure Claims.
A. Introduction. Having rejected the federal model, I now turn to consider whether there is a basis for some kind of constitutionally based immunity for officers who violate state constitutional rights. In doing so, it is important to emphasize that we are not engaging in an act of statutory interpretation but instead an act of constitutional interpretation.
B. First and Foremost: Emphasis in the Iowa Constitution on Bill of Rights. As noted in Godfrey , the Iowa constitutional founders placed strong emphasis on the Bill of Rights provisions of the Iowa Constitution. 898 N.W.2d at 864. The Bill of Rights of the Iowa Constitution was deliberately designed "to put upon record every guarantee that could be legitimately placed [in the constitution]." Id. (quoting 1 The Debates at 100 (alteration in original)). The placement of the Bill of Rights in the very first article in the Iowa Constitution, ahead of articles describing legislative and executive power, was not a result of happenstance. According to George Ells, Chair of the Committee on the Preamble and Bill of Rights, "the Bill of Rights is of more importance than all the other clauses in the Constitution put together, because it is the foundation and written security upon which the people rest their rights." Id. (quoting The Debates at 103). Given the obvious importance of the Iowa Bill of Rights in the state constitutional scheme, it must be effectively enforced. See id. at 865.
C. "Thoroughly Well-Settled": Iowa Caselaw Imposing Damages on Officials for Unconstitutional Searches and Seizures. As we noted in Godfrey , the Iowa founding generation was well aware of the English cases where officers of the Crown were liable for substantial damages for unlawful searches and seizures. Id. at 866-67. In Sanders v. State , the Iowa Supreme Court cited Entick , using as its source Howell's State Trials, a popular compendium of English law cases. 2 Iowa 230, 239 (1855) ; see Godfrey , 898 N.W.2d at 867. In McClurg v. Brenton , we reversed a trial court dismissal of a damages action against a mayor, a chief of police, and a captain of police where a search was conducted without a warrant. 123 Iowa 368, 369, 371-72, 98 N.W. 881, 881-83 (1904). A few years later, we reaffirmed the notion that the *293 right of citizens to be secure in person and property against wrongful searches and seizures is "zealously safeguarded and has express recognition in our state Constitution." Krehbiel v. Henkle (Krehbiel I ), 142 Iowa 677, 679-80, 121 N.W. 378, 379-80 (1909). We further stated that it was "thoroughly well settled" that "a violation of this right without reasonable ground therefor gives the injured party a right of action." Id. at 680, 121 N.W. at 380. We later affirmed an award of punitive damages in the case based upon the defendant's "wanton and reckless" disregard of the plaintiff's rights. Krehbiel v. Henkle (Krehbiel II ), 152 Iowa 604, 606, 129 N.W. 945, 945, modified on other grounds , 152 Iowa 604, 607, 133 N.W. 115, 115 (1911) (per curiam).
The majority cites Krehbiel I in support of its view that in Iowa, malice or want of probable cause must be shown to support a damage action for unconstitutional search and seizure. 142 Iowa at 680, 121 N.W. at 380. But the tort involved in Krehbiel was malicious prosecution. Id. Because the issue was framed as malicious prosecution, malice was an element of the offense. Id. The reference in the case to whether there was a reasonable ground for the search does not appear to be an assertion of immunity but is consistent with the notion that a search is reasonable if it is undertaken pursuant to a valid warrant or undertaken pursuant to a valid exception to the warrant requirement. See Thomas Y. Davies, Recovering the Original Fourth Amendment , 98 Mich. L. Rev. 547, 576-90 (1999).
The majority also cites the cases of Hetfield v. Towsley , 3 Greene 584 (Iowa 1852), and Howe v. Mason , 12 Iowa 202 (1861). These cases involve judicial immunity, Howe , 12 Iowa at 203-04 ; Hetfield , 3 Greene at 585, a concept well-recognized at common law and distinct from a claim against officers engaged in search-and-seizure-type activities, see, e.g. , Pierson , 386 U.S. at 553-54, 87 S.Ct. at 1217-18. The majority opinion thus conflates apples and oranges. Judges historically have been absolutely immune because of the peculiar characteristics of and the safeguards built into the judicial process, including rights of appeal. See Butz v. Economou , 438 U.S. 478, 512, 98 S.Ct. 2894, 2913, 57 L.Ed.2d 895 (1978). Such absolute immunity has not historically been extended to other government officials exercising different governmental functions. It is wrong to suggest that Hetfield and Howe stand for the proposition that immunity should be extended to executive branch officials charged with violating article I, section 1 and article I, section 8 of the Iowa Constitution when the official functions involved are materially different. See Butz , 438 U.S. at 511, 98 S.Ct. at 2913 ("Judges have absolute immunity not because of their particular location within the Government but because of the special nature of their responsibilities.").
The majority also miscites Plummer v. Harbut , 5 Iowa 308 (1857). In this unlawful search and seizure case, the plaintiff was deprived of compensatory damages not because of the good faith of the officers, as claimed by the majority, but because a party seeking to recover damages, for the seizure and destruction of intoxicating liquors, must show that he possessed them with a lawful intent. Id. at 312-13. Because possession of the intoxicating liquor was unlawful, compensatory damages were not available. Id. at 313. The good-faith discussion in the case was not directed to the issue of compensatory damages, as the majority suggests, but to the issue of punitive damages. Id. at 314. As the Plummer court stated, "Where a ministerial officer acts in good faith, he is not liable to exemplary damages for an injury done." Id. In the Plummer case, the proposition that *294 "good faith" in the search and seizure context was not relevant to the issue of compensatory damages but only to the issue of punitive damages.
Finally, the majority dismisses language in Girard v. Anderson that directly and plainly states, "A violation of the state and federal constitutional provisions against the unreasonable invasion of a person's home gives the injured party a right of action for damages for unlawful breaking and entering." 219 Iowa 142, 148, 257 N.W. 400, 403 (1934). The majority rejects the relevance of Girard by stating that the case involved an intrusion by a private party. That is true enough, but among the cases cited by the Girard court in support of the statement that an injured party has a cause of action was McClurg , a case involving misconduct of officials. See id. at 148, 257 N.W. at 403 (citing McClurg , 123 Iowa 368, 98 N.W. 881 ). By citing McClurg , it is hard to believe the Girard court subscribed to the narrow interpretation embraced by the majority.
Recently in Godfrey , we stressed the need for effective enforcement of constitutional norms through private causes of action to recover for harms caused by unconstitutional conduct. 898 N.W.2d at 865. We quoted Justice Harlan's concurrence in Bivens for the proposition that "the judiciary has a particular responsibility to assure the vindication of constitutional interests." Id. (quoting Bivens , 403 U.S. at 407, 91 S.Ct. at 2010 (Harlan, J., concurring in the judgment)).
D. Constitutional Caselaw from Other Jurisdictions on the Question of Qualified Immunity Under State Constitutional Provisions. The state courts are divided on the question of whether there should be some kind of immunity doctrine that relieves individual officers of potential liability for constitutional wrongs.
Some cases follow the United States Supreme Court approach to statutory qualified immunity in the interpretation of their state constitutions. A good example of an unreflective "me too" case is Moresi v. Department of Wildlife & Fisheries , 567 So.2d 1081 (La. 1990). There, the Louisiana court wrote,
The same factors that compelled the United States Supreme Court to recognize a qualified good faith immunity for state officers under § 1983 require us to recognize a similar immunity for them under any action arising from the state constitution.
Id . at 1093. Needless to say, this uncritical analysis, for all the reasons expressed above, is unpersuasive.
On the other hand, the Maryland Court of Appeals, in Clea v. Mayor of Baltimore , held that city officials were not entitled to immunity for violations of individuals' rights under the Maryland Declaration of Rights. 312 Md. 662, 541 A.2d 1303, 1314 (Md. 1988), superseded by statute on other grounds , Md. Code Ann., State Gov't § 12-101(a), as recognized in D'Aoust v. Diamond , 424 Md. 549, 36 A.3d 941, 962 (2012). In Clea , the plaintiffs brought both an ordinary tort suit and a constitutional claim against several officials including a police officer, for an allegedly unlawful search of the plaintiffs' home. Id. at 1304. The defendant police officer asserted he was entitled to qualified immunity. Id.
The Clea court held that while the police officer was immune from the ordinary tort claims because he did not act with malice, the immunity statute could not be lawful as applied against claims under the Maryland Declaration of Rights. Id. at 1311, 1312. The court stated that "there are sound reasons to distinguish actions to remedy constitutional violations from ordinary tort suits." Id. at 1314. The court emphasized "[t]he purpose of a negligence *295 or other ordinary tort action is not specifically to protect individuals against government officials or to restrain government officials," but only "to protect one individual against another individual." Id.
On the other hand, the Clea court noted that the constitutional provisions in the Declaration of Rights of the Maryland Constitution were "specifically designed to protect citizens against certain types of unlawful acts by government officials." Id. According to the Clea court,
To accord immunity to the responsible government officials, and leave an individual remediless when his constitutional rights are violated, would be inconsistent with the purpose of the constitutional provisions. It would also ... largely render nugatory the cause of action for violation of constitutional rights recognized [in Maryland's Godfrey -type cases].
Id.
The Montana Supreme Court has adopted an approach similar to that in Clea . In Dorwart v. Caraway , the Montana Supreme Court rejected qualified immunity for state constitutional torts. 312 Mont. 1, 58 P.3d 128, 140 (2002). The Dorwart court agreed with the analysis presented in Clea . Id. at 139. It also emphasized, however, unique aspects of the state constitution, including provisions prohibiting local governments from immunity from suit except as provided by a two-thirds vote of each house of the legislature. Id. at 139-40.
Also instructive is Corum v. University of North Carolina ex rel. Board of Governors , 330 N.C. 761, 413 S.E.2d 276 (1992). In Corum , the North Carolina Supreme Court considered an action brought by a discharged faculty member alleging his termination violated his right to free speech. Id. at 280. The defendants included the university and various university officials. Id. at 282. The North Carolina Supreme Court held that a direct action to enforce free speech under the North Carolina Constitution was essential to preserve the rights guaranteed by that provision. Id. at 289.
The Corum court also considered the question of whether the doctrine of sovereign immunity had any application in the case. Id. at 291. The court held that it did not. Id. According to the court, "the doctrine of sovereign immunity cannot stand as a barrier to North Carolina citizens who seek to remedy violations of their rights guaranteed by the Declaration of Rights [in the state constitution]." Id . The court noted that the Declaration of Rights is the first article in the state constitution and emphasized its primacy in the minds of the North Carolina framers. Id. at 289-90. The court stated,
It would indeed be a fanciful gesture to say on the one hand that citizens have constitutional individual civil rights that are protected from encroachment actions by the State, while on the other hand saying that individuals whose constitutional rights have been violated by the State cannot sue because of the doctrine of sovereign immunity.
Id. at 291. While the Corum court spoke in terms of sovereign immunity and not qualified immunity, it appeared to be considering an immunity claim made by an individual defendant, i.e., the plaintiff's immediate supervisor and an official at the university involved in the case, and not a claim made by the university. See id. at 281, 292.
E. Impact of Godfrey on the Enforcement of Constitutional Provisions. In Godfrey , we held that the due process and equal protection provisions of the Iowa Constitution are self-executing and that citizens have a direct action for damages caused by unconstitutional conduct under *296 the Iowa Constitution. 898 N.W.2d at 846-47, 871-72. However, we specifically left open the question of whether government officials were entitled to qualified immunity with respect to direct claims brought under the Iowa Constitution. Id. at 879 (plurality opinion). While we reserved the question of qualified immunity, it is important that the general principles of Godfrey , which held citizens have the right to bring direct claims under the Constitution, be consistently applied in this case, addressing the scope of the direct remedies recognized in Godfrey .
In Godfrey , we emphasized that "[i]f the[ ] individual rights in the very first article of the Iowa Constitution are to be meaningful, they must be effectively enforced." Id. at 865 (majority opinion). We quoted Justice Harlan for the proposition that "the judiciary has a particular responsibility to assure the vindication of constitutional interests." Id. (quoting Bivens , 403 U.S. at 407, 91 S.Ct. at 2010 ). We noted, "It would be ironic indeed if the enforcement of individual rights and liberties in the Iowa Constitution, designed to ensure that basic rights and liberties were immune from majoritarian impulses, were dependent on legislative action for enforcement." Id. We explained that the Iowa Constitution put its Bill of Rights in article I, indicating the Bill of Rights' primacy, and that the Iowa Constitution generally tends to limit the scope of legislative powers. Id. at 864-65. We stated, "We cannot imagine the founders intended to allow government wrongdoers to set their own terms of accountability through legislative action or inaction." Id. at 866. It is plain from Godfrey that constitutional rights must be effectively enforced, the court is the principle institution of government to ensure that such effective enforcement occurs, and action or inaction of the legislature cannot be an effective barrier to wholesome judicial enforcement of the Iowa Bill of Rights. See id. at 865-66. We must not abandon these Godfrey principles today in this companion case.
In Godfrey , we also discussed the availability of punitive damages for constitutional wrongs. Id. at 875-79 (plurality opinion). Three members of the court concluded that because the Iowa Civil Rights Act (ICRA) did not include punitive damages, it did not preempt a direct constitution claim alleging that the defendants acted unconstitutionally in violation of the equal protection clause of the Iowa Constitution. Id. at 879. In a separate opinion, Chief Justice Cady came to the conclusion that while lack of punitive damages could lead to a finding that a statutory remedy is inadequate, it was not under the specific facts of Godfrey's case. Id. at 880-81 (Cady, C.J., concurring in part and dissenting in part).
There is substantial authority to support the position that, in a search and seizure case, punitive damages should be allowed. The damages awarded in the Wilkes cases exceeded the injury. See Godfrey , 898 N.W.2d at 866 (majority opinion) (explaining that Wilkes was awarded £1000 and Huckle £300); see also 1763 Pounds in 2017 , UK Inflation Calculator, https://www.officialdata.org/1763-GBP-in-2017?amount=1300 [https://perma.cc/CG72-D7HL] (last visited June 26, 2018) (calculating that £1300 in 1763 is about £245,000 in 2017). In Huckle , the amount of awarded damages was fifteen times the actual damages, with the court observing,
I think they have done right in giving exemplary damages. To enter a man's house by virtue of a nameless warrant, in order to procure evidence, is worse than the Spanish Inquisition; a law under which no Englishman would wish to live an hour; it was a most daring public *297 attack made upon the liberty of the subject.
Godfrey , 898 N.W.2d at 866 (quoting Huckle , 95 Eng. Rep. at 769); see also Simpson v. McCaffrey , 13 Ohio 508, 522-23 (1844) (en banc) (allowing "damages beyond compensation" for search and seizure violations). Iowa followed the common law approach to punitive damages in Krehbiel II , 152 Iowa at 606, 129 N.W. at 945. In Krehbiel II , the court affirmed an award of punitive damages on the ground that such damages were available for conduct that "was wanton and reckless and in disregard of the plaintiff's rights." Id.
Chief Justice Cady's concurring opinion in Godfrey provided the deciding vote on the question of whether the lack of a punitive damages remedy in the ICRA prevented the Act from preempting a direct constitutional claim. 898 N.W.2d at 880-81 (Cady, C.J., concurring in part and dissenting in part). Chief Justice Cady concluded that on the facts of the Godfrey case, the lack of a punitive damages remedy did not cause the remedies in the ICRA to be inadequate. Id. Chief Justice Cady noted that the ICRA provides attorney's fees, a remedy that might compensate for a lack of availability of punitive damages. Id. at 881. He acknowledged, however, that "[i]n the appropriate case, a remedy of punitive damages may be necessary to vindicate a plaintiff's constitutional rights." Id. But, according to Chief Justice Cady,
when the claimed harm is largely monetary in nature and does not involve any infringement of physical security, privacy, bodily integrity, or the right to participate in government, and instead is against the State in its capacity as an employer,
punitive damages are not a necessary remedy. Id . This search and seizure case, of course, does involve infringement of physical security and bodily integrity. Under Chief Justice Cady's concurring opinion, punitive damages may well be necessary to vindicate the plaintiff's constitutional rights, just as it was in Krehbiel . See id. ; Krehbiel II , 152 Iowa at 606, 129 N.W. at 945.
F. Discussion. The mere lifting of federal statutory qualified immunity doctrine and supplanting it into analysis of constitutional claims under the Iowa Constitution is a nonstarter. The question is whether we should independently develop a judge-made doctrine of qualified immunity to relieve public officials from liability for damages arising from their unlawful conduct as a supplement to the constitutional text contained in article I of the Iowa Constitution.
I conclude that we should not manufacture a qualified immunity doctrine for constitutional wrongs of public officials. Our state constitutional tradition places strong emphasis on the Bill of Rights. See Godfrey , 898 N.W.2d at 864 (majority opinion). There can simply be no doubt that limiting the remedies available for violations of constitutional provisions limits the substantive protections of those constitutional provisions for all practical purposes. Justice Harlan was spot-on when he observed that the relationship between substance and remedy is one-on-one. See Bivens , 403 U.S. at 400 n.3, 91 S.Ct. at 2007 n.3. No one can plausibly argue otherwise.
There can be little doubt that the Bill of Rights in the Iowa Constitution was intentionally placed in article I to emphasize its primacy in the constitutional scheme. It precedes articles establishing executive and legislative powers. The notion that legislative powers in article III of the Iowa Constitution could eviscerate the Bill of Rights in article I is a topsy-turvy approach to our state constitutional structure. Further, the prominent English common law cases where government officials *298 were found liable for search and seizure violations were well known in the colonies and to lawyers and judges at the time of the Iowa constitutional convention, as demonstrated by a citation to Entick by the Iowa Supreme Court in 1855. See, e.g. , Godfrey , 898 N.W.2d at 866-67 ; Sanders , 2 Iowa at 239. Our early search and seizure cases tend to reinforce the notion that money judgments against officials were an appropriate way to compensate plaintiffs and deter future misconduct. See, e.g. , Krehbiel II , 152 Iowa at 606, 129 N.W. at 945 ; McClurg , 123 Iowa at 369-70, 98 N.W. at 881-82. We should not dilute the remedy with a qualified immunity doctrine.
This is especially true when it comes to search and seizure issues. In State v. Tonn , we noted that "[a] trespassing officer is liable for all wrong done in an illegal search or seizure." 195 Iowa 94, 106, 191 N.W. 530, 535 (1923), overruled on other grounds by State v. Cline , 617 N.W.2d 277, 291 (Iowa 2000) (en banc), overruled on other grounds by State v. Turner , 630 N.W.2d 601, 606 n.2 (2001). Echoing the sentiments of judges in the Wilkes cases and anticipating the later views of Justice Jackson in Brinegar , we emphasized that the right against unreasonable searches and seizures was "a sacred right, and one which the courts will rigidly enforce." Id. To embrace qualified immunity diluting the ability to enforce search and seizure law hardly elevates the right to "sacred status" or provides "rigid enforcement."
The "rigid enforcement" of search and seizure law was reflected in Cline . In Cline , we considered whether we should adopt a good-faith exception to the exclusionary rule for search and seizure violations under article I, section 8 of the Iowa Constitution. Id. at 288. We refused to do so. Id. at 292-93. If we adopted such a rule, we pointed out, the standard would be "close enough is good enough." Id. at 290 (quoting State v. Marsala , 216 Conn. 150, 579 A.2d 58, 68 (Conn. 1990) ). It would, "in effect, remove the probable cause requirement from [ article I, section 8 ]." Id. (quoting People v. Sundling , 153 Mich.App. 277, 395 N.W.2d 308, 314 (Mich. Ct. App. 1986), abrogated on other grounds by People v. Russo , 439 Mich. 584, 487 N.W.2d 698, 706 & n.31 (Mich. 1992) ). Quoting a New Mexico court, we emphasized that the constitution was designed "to create more than 'a code of ethics under an honor system.' " Id. at 291 (quoting State v. Gutierrez , 116 N.M. 431, 863 P.2d 1052, 1067 (N.M. 1993) ). Further, we noted that "[t]he reasonableness of a police officer's belief" in the lawfulness of his or her conduct "does not lessen the constitutional violation." Id . at 292.
This case is the civil counterpart of Cline . If we disallowed a good-faith defense in a criminal case on the question of admission of evidence, we certainly ought to allow a wronged citizen to seek damages for harm caused by the unconstitutional conduct of state or local government officials. And we should not lightly glide over the cautions of Justice Jackson that "[u]ncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government." Brinegar , 338 U.S. at 180, 69 S.Ct. at 1313.
Further, it is critically important that state officials are not above the law or even perceived to be above the law when it comes to enforcement of provisions of article I against state and local governments. As noted by the New York Court of Appeals in Brown v. State ,
no government can sustain itself, much less flourish, unless it affirms and reinforces the fundamental values that define it by placing the moral and coercive powers of the State behind those values. When the law immunizes official violations of substantive rules because the *299 cost or bother of doing otherwise is too great, thereby leaving victims without any realistic remedy, the integrity of the rules and their underlying public values are called into serious question.
89 N.Y.2d 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129, 1144 (N.Y. 1996).
As noted above, the claim that local officials will be deterred by the possibility of tort liability, is unbalanced. The opposite view-that without tort liability there will be less incentive to follow constitutional dictates-must be considered as well.
In any event, the basic premise that qualified immunity is needed to prevent overdeterrence of official conduct has little support. A recent study by Professor Joanna Schwartz confirms what one might suspect, namely, that at least with respect to police officers, local governments almost always indemnify for settlements and judgments arising out of misconduct lawsuits. See Joanna C. Schwartz, Police Indemnification , 89 N.Y.U. L. Rev. 885, 912 (2014). Specifically, the Schwartz study found that in the forty-four largest jurisdictions studied, police officers paid .02% of the over $730 million paid for misconduct suits between 2006 and 2011. Id. at 960. In the thirty-seven smaller police departments included in the study, Schwartz found there were no officer contributions towards settlements and judgments during that time. Id. In short, according to Schwartz, in many jurisdictions "officers are more likely to be struck by lightning than they are to contribute to a settlement or judgment in a police misconduct suit." Id. at 914. The fact that officers are almost always indemnified undercuts one of the primary arguments in favor of the immunity doctrine-that without it, officers will be deterred from engaging in appropriate activities for fear of the financial consequences of a wrong decision.
Whether or not to indemnify local officials for their unconstitutional conduct is a policy matter that the Iowa legislature has already decided. Iowa Code section 669.21 indemnifies state officials against claims, including constitutional claims, subject to a few exceptions. Iowa Code § 669.21. Likewise, section 670.8 indemnifies municipal officials "against any tort claim or demand," subject to a few exceptions. Id. § 670.8. We have no occasion to develop a doctrine to relieve individual municipal officers from potential liability for constitutional wrongs-that has been done by other branches of government, just as it was in the antebellum period before the modern United States Supreme Court developed its innovative approach to qualified immunity. See Pfander & Hunt, 85 N.Y.U. L. Rev. at 1925-26.
The majority has created a "negligence" immunity to violations of search and seizure prohibitions under article I, section 8 of the Iowa Constitution, largely based on the work of Professor John Jeffries. As Professor Jeffries himself has noted, his approach "is opposed by the weight of academic opinion, which favors strict liability for all constitutional violations." See John C. Jeffries Jr., Disaggregating Constitutional Torts , 110 Yale L.J. 259, 262 n.16 (2000) ; see also Amar, 96 Yale L.J. at 1490-91 ; Mark R. Brown, The Demise of Constitutional Prospectivity: New Life for Owen? , 79 Iowa L. Rev. 273, 311-12 (1994) ; Harold S. Lewis Jr. & Theodore Y. Blumoff, Reshaping Section 1983'sAsymmetry , 140 U. Pa. L. Rev. 755, 756 (1992) ; Sheldon Nahmod, Constitutional Damages and Corrective Justice: A Different View , 76 Va. L. Rev. 997, 1019 (1990) ; Christina B. Whitman, Government Responsibility for Constitutional Torts , 85 Mich. L. Rev. 225, 229-30 (1987) (endorsing strict governmental liability for constitutional violations). There is nothing wrong with following the minority view in academia or, for *300 that matter, the minority view in the courts. But the reasoning of the majority view, which is largely expressed in the body of this opinion, is worth considering. The majority in this case pretty much ignores it.
Rather than follow the state's motto, "Our Liberties We Prize and Our Rights We Will Maintain," the majority follows an approach that suggests "Our Liberties Are Transient and Our Rights Are Expendable." There is no sound policy basis to adopt such a negligence exception under article I, section 8 of the Iowa Constitution, particularly when individual municipal officers are indemnified for most claims that arise out of their official acts. See Iowa Code § 670.8. The majority has no response to this point. And how interesting it is that while the majority is concerned that government conduct will be chilled, it is not at all concerned that by granting immunity, unconstitutional conduct may be encouraged. And wholly absent from the majority opinion is any concern at all for a citizen who may suffer grievous harm as a result of the unconstitutional conduct of a government official. In effect, the majority has moved article I of the Iowa Constitution from its place of primacy and made it article V, behind the provisions establishing executive and legislative power. According to the majority, the emphasis in the Iowa Constitution is not on rights but government power.
In addition, the negligence standard could be applied in an unsound fashion to chew and choke potential liability. The search and seizure provision of article I, section 8 uses the term "unreasonable." We have observed that the term cannot be regarded as an open-ended, stand-alone "reasonableness" test shorn from its linguistic and historical context. See Ochoa , 792 N.W.2d at 289. I fear, however, that some members of the court will take the ahistorical approach and see reasonableness as the touchstone of search and seizure law and then will, in light of this opinion, frame the immunity question in the search and seizure context as, "Was it reasonable for the officer to believe his or her conduct was reasonable?" See Anderson v. Creighton , 483 U.S. 635, 664 & n.20, 107 S.Ct. 3034, 3052 & n.20, 97 L.Ed.2d 523 (1987) (Stevens, J., dissenting). Such double counting of "reasonableness," if it occurs, would eviscerate enforcement of article I, section 8. Double counting reasonableness seems to be a fantastic result, but the lack of sensitivity in the majority opinion to the enforcement of search and seizure rights does not give me high confidence that a highly distorted approach to immunity will not be applied in future search and seizure cases under article I, section 8. If a reasonableness-on-reasonableness approach does apply, the enforceability of the search and seizure provisions of the Iowa Constitution will be geometrically undermined.
Further, although the majority eschews Harlow , it will be interesting to see whether the concept of "clearly established rights" creeps back in under the banner of negligence on an as-needed basis to defeat claims of compensation. See 457 U.S. at 818, 102 S.Ct. at 2738. If it does, of course, the claim in the majority rejecting Harlow as having no place in Iowa law will be overstated.
In any event, for search and seizure cases in Iowa individual officers will now have a judge-created immunity based upon a due-care or negligence standard. The judge-created negligence standard is an amorphous one but presumably follows the law of torts. If so, whether immunity is available will, in many cases, depend upon the fact finder's evaluation of the reasonableness of police compliance with constitutional *301 requirements under all the facts and circumstances.
In the future, it will be interesting to see if the majority fashions additional judge-made rules in the application of its negligence standard to further prevent persons from obtaining remedies for constitutional harms inflicted by government officials. Specifically, we must wait and see if under the rubric of negligence, the court allows the return of either "clearly established rights" approach of Harlow , or applies the reasonableness-on-reasonableness approach to undercut constitutional claims, as I have described above. If so, the substantial harm caused by this majority opinion will be worse than advertised and liability for serious article I, section 1 and article I, section 8 violations may be more fictitious than real.
There is also some ominous language in the majority opinion suggesting that various provisions of Iowa Code chapters 669 and 670 might be used to ensure that Iowa citizens cannot recover for the constitutional harms caused by government officials. As indicated above, application of legislative restrictions on the ability of private citizens to recover for constitutional harms imposed on them by the government has a fox-in-the-henhouse quality. The very suggestion, for instance, that Iowa Code section 669.14(4), which prohibits "[a]ny claim [for damages] arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights," is a legislatively created vehicle to prevent citizens from recovering from grievous constitutional harm is astounding. The idea that the government might be immune from liability for an unconstitutional beating using excessive force, for example, is what one might expect in an authoritarian state, not a democracy. Further, the suggestion that punitive damages may not be awarded for constitutional torts, as suggested in Iowa Code section 670.4(1)(e ), would be absolutely astounding to the founding and antebellum generations so familiar with the Wilkes cases. If there are to be any cases where private citizens who are harmed by unconstitutional conduct are to be prevented from being compensated by the officers who caused the harm, that decision should be determined by the court and not the legislature.
IV. Conclusion.
The majority opinion is misguided. It does not mention the role of the historic Wilkes cases and the dramatic impact these cases had on American law-a part of history, apparently, that is best forgotten. It embraces a constitutional "gap" theory and fails to recognize that rights and remedies, as Justice Harlan so eloquently pointed out in Bivens , have a 1:1 correlation and that the reduction in the scope of remedies necessarily involves a reduction in the scope of the constitutional protections for citizens. See 403 U.S. at 400 n.3, 91 S.Ct. at 2007 n.3. The majority speculatively declares that liability for damage caused by unconstitutional conduct may overdeter officials from engaging in their duties but remarkably fails to recognize that a nonliability rule may have an equal and opposite effect: underdeterrence of unconstitutional conduct. The majority's finding that the speculative overdeterrence of actions of officials is weighty while the risk of underdeterrence of unconstitutional conduct infringing on individual rights is not mentioned at all , suggests a results-oriented jurisprudence that favors government officials who inflict unconstitutional harms over citizens who endure them. Further, the majority opinion ignores the fact that if overdeterrence is a problem, the legislature is free to provide indemnity for individual officers, which the Iowa legislature *302 has largely done. See Iowa Code § 669.21 ; id. § 670.8. The majority's vague suggestion that sweeping statutory immunities might be a source of law to undermine the protections of article I of the Constitution is unsound as a matter of constitutional law and fails to recognize the fundamental role that article I rights play in limiting the exercise of government power by the executive and legislative branches of government. The majority fails to recognize that granting immunity to officials for unconstitutional conduct leaves the burden of the harm from that unconstitutional conduct on the injured citizen instead of on the officials acting unconstitutionally.
The majority states that it has thrown Harlow overboard. Whether the ghost of Harlow will reemerge in another form remains to be seen. And just how great a barrier the negligence immunity standard will be to prevent injured citizens attempting to recover from the unconstitutional conduct of government officers will depend on future caselaw.
For the above reasons and the other reasons expressed in this opinion, I dissent.
Hecht, J., joins this dissent.